**Michael J. Petitti, Jr. – 011667**
**SHIELDS PETITTI & ZOLDAN, PLC**
**5090 N. 40th Street, Suite 207**
**Phoenix, Arizona 85018**
**Telephone: (602) 718-3330**
**Facsimile: (602) 675-2356**
**E-Mail:  mjp@shieldspetitti.com**

Attorneys for Plaintiff

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Michelle Mulligan, | No. |
| Plaintiff, | |
| v. | **COMPLAINT** |
| Grand Canyon University, | |
| Defendant. | |

Plaintiff Michelle Mulligan ("Plaintiff" or "Ms. Mulligan") for her cause of action against Defendant alleges:

### GENERAL ALLEGATIONS
### (Parties and Jurisdiction)

1.    Plaintiff is a resident of Maricopa County, Arizona and was a resident of Maricopa County during all relevant times.

2.    Defendant Grand Canyon University ("Defendant") is a domestic nonprofit corporation located in Maricopa County, Arizona.

3.    Defendant has committed actions and caused events to occur in Maricopa County which are the foundation of this action and out of which this action arises.

4.    This Court has jurisdiction pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1343(a)(4), and 42 U.S.C. § 2000(e)-5.

1366321.1

5.     Venue is proper under 28 U.S.C. § 1391 because the acts detailed in this Complaint occurred within the District of Arizona and all parties reside within the District of Arizona.

**(Nature of Action)**

6.     This is an action brought by Plaintiff to vindicate violations of Title VII of the Civil Rights Act of 1964, as amended ("Title VII").

**(Jury Demand)**

7.     Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury of any issue triable of right by a jury.

**FACTS COMMON TO ALL CLAIMS FOR RELIEF**

8.     On August 5, 2019, Defendant hired Plaintiff as a Campus Safety Guard for the Public Safety Department. Plaintiff performed her job satisfactorily.

9.     Plaintiff's job involved manning the guard booth at the various entrances to the Grand Canyon University ("GCU") campus and patrol duty.

10.     Patrol duty included responding to emergency calls on campus, providing initial first aid, searching for restricted items, performing wellness checks, following up on reports of suspicious persons, locking/unlocking doors, handling elevator entrapments, and generally providing assistance to students, staff, and campus guests.

11.     Campus Security guards rotated between booth duty and patrol/field duty throughout their shifts.

12.     In March 2021, several construction workers, parents, and students made sexual comments to Ms. Mulligan while she was working the booth, which interfered with her ability to perform her job.

13.     Ms. Mulligan reported this to her supervisor, Campus Safety Supervisor Fredy Tapia, who informed his manager, Campus Safety Manager Robin Schimetz.

1366321.1

14.    Mr. Schimetz instructed Mr. Tapia to temporarily remove Ms. Mulligan from booth duty and place her in the field so she could "catch her breath." The patrol assignment was brief, lasting less than two weeks.

15.    However, the other guards did not know the reason why Ms. Mulligan was given what they considered to be a preferential assignment, so rumors began circulating.

16.    On or about March 11, 2022, Ms. Mulligan learned that Campus Safety Manager Arnold Washington instructed her supervisor to prohibit Ms. Mulligan from using his computer; she had even heard Mr. Washington tell her supervisor, "Get her out of there!" when she was using his computer to complete a work report. Leading up to this point, Ms. Mulligan had a strained relationship with Mr. Washington.

17.    When Ms. Mulligan first started at GCU, she and Mr. Washington initially bonded over their shared trauma of child loss. This led to Mr. Washington requesting hugs from Ms. Mulligan, which made her uncomfortable. Ms. Mulligan eventually told Mr. Washington that she wanted the hugs to stop and keep their interactions strictly professional.

18.    Thereafter, his attitude towards her changed for the worse. For example, Mr. Washington became brusque and did not speak to Ms. Mulligan other than to say hello.

19.    When she arrived at work on Saturday, March 12, 2022, Ms. Mulligan asked to speak with Mr. Washington because she wanted to understand why she was being singled out for exclusion.

20.    Instead of having a private conversation in the office, Mr. Washington came to the booth where Ms. Mulligan was working and initiated the conversation while she was in between assisting campus guests. Ms. Mulligan asked why she was not allowed in the supervisors' area. Male guards were allowed in the supervisors' area.

21.    Ms. Mulligan shared with Mr. Washington an extensive account of the

3

inappropriate comments by men she had had to endure while working the guard booth and that she did not appreciate the rumors being spread about her and male co-workers.

22. In this context, Ms. Mulligan stated, "It's not right. I mean, I'm not like that. I have taste!" In response, Mr. Washington twice remarked, "You can taste me."

23. Ms. Mulligan was extremely offended by this outrageous and sexually suggestive comment – especially because it came from a member of senior management and immediately after she had just complained about inappropriate comments. After tearfully explaining the incident to the supervisor on duty, Ms. Mulligan went home for the day.

24. Mr. Washington frantically tried to contact Ms. Mulligan on her cell phone to do damage control, but Ms. Mulligan did not answer his calls or texts.

25. Ms. Mulligan also reported the incident to Mr. Tapia, who was on vacation at the time. He told her to write down everything that had happened and provide it to Mr. Schimetz, which she did.

26. On March 13, 2022, Ms. Mulligan had a 35-minute phone conversation with Assistant Director, James Jackson, concerning her complaint. However, the first 25 minutes of the call consisted of Mr. Jackson chastising Mr. Mulligan for making the complaint and claiming that she was the benefactor of favoritism from another person altogether – Mr. Tapia.

27. Ms. Mulligan thought it was highly inappropriate for senior management to respond to her complaint in this way, not focusing on the offensive conduct, but shifting blame to her and Mr. Tapia, and making excuses for Mr. Washington.

28. Tellingly, Ms. Mulligan was never spoken to about supposed favoritism or a possible personal relationship between her and Mr. Tapia until after she lodged her complaint against Mr. Washington. Ms. Mulligan understood that her complaint was not being taken seriously.

4

1366321.1

29.     The perception of favoritism cast a shadow over Ms. Mulligan's good faith concerns of sexual harassment and distracted from the substance of her complaint.

30.     In fact, on March 13, 2022, Mr. Jackson sent an email to HR advising of Ms. Mulligan's complaint. In it, he included extensive commentary regarding his allegations of favoritism between Mr. Tapia and Ms. Mulligan. Mr. Jackson was attempting to taint HR's investigation of the sexual harassment complaint and discredit Ms. Mulligan.

31.     In the wake of Ms. Mulligan's complaint, Mr. Washington began showing up wherever she was, blocking doorways and hallways, in a clear attempt to intimidate her.

32.     On her first day back following the complaint, Mr. Washington positioned himself leaning against the doorway at the entrance to the office, which Ms. Mulligan had never seen him do before, such that she had to walk around him to swipe her badge and enter the building. Other employees witnessed Mr. Washington's conduct and the panic attack she had in reaction.

33.     On April 2, 2022, Mr. Lovett observed Mr. Washington standing near the time clock with his arms crossed. Mr. Washington did not say anything to anyone until Ms. Mulligan walked by, at which point he leaned toward her and said, "Good morning," in an intimidating way. This interaction made Ms. Mulligan visibly uncomfortable. Mr. Lovett indicated that he feared retaliation for reporting this because Mr. Washington "has a reputation of being a bully and using intimidation as a weapon."

34.     Ms. Mulligan called Human Resources several times to request that someone meet with her regarding her sexual harassment complaint, but ten (10) days passed before Danielle Espinosa spoke with her. Even then, Ms. Espinosa admitted that she had not bothered to read Ms. Mulligan's entire complaint.

35.     After a 32-day investigation, during which Mr. Washington continued to supervise

5

Ms. Mulligan two (2) days per week, Defendant informed Ms. Mulligan that it did not substantiate her complaint. Defendant was slow to take any action on Ms. Mulligan's complaint. Ms. Mulligan was instructed that she needed to keep things professional and continue working with Mr. Washington, as their schedules overlapped on Fridays and Saturdays.

36.     Ms. Mulligan felt abandoned by GCU management and continued suffering panic attacks and having anxiety.

37.     On April 15, 2022, GCU fired Mr. Tapia due to the perception of favoritism. With Mr. Tapia gone, there was no buffer between Ms. Mulligan and Mr. Washington on Fridays and Saturdays, when they both worked.

38.     Ms. Mulligan felt helpless because GCU did not meaningfully investigate her allegation, and instead took Mr. Washington at his word; and based on GCU's edict, Ms. Mulligan would continue working with Mr. Washington, subjecting herself to further intimidation and harassment.

39.     Ms. Mulligan could not continue working in an environment that was unbearably hostile and was impacting both her health and reputation.

40.     She submitted her resignation, citing sexual harassment, discrimination and retaliation as the reasons.

41.     On August 15, 2022, Plaintiff timely filed a charge of sex discrimination and retaliation with the Equal Employment Opportunity Commission ("EEOC"). The EEOC issued its Notice of Right to Sue. (A copy of the Notice is attached and incorporated as Exhibit 1.)

42.     Plaintiff is damaged by the wrongful acts of Defendant and its agents as herein alleged, which damage includes, without limitation, the following:

1366321.1

a.  Lost salary and employment benefits since the date of Plaintiff's forced resignation until she obtains employment at a similar rate of compensation;

b.  Injury to Plaintiff's long-term employment opportunities, reputation and income potential flowing from the wrongful conduct by Defendant; and

c.  Injury from humiliation, trauma, extreme stress, anxiety, depression and physical and mental pain and anguish.

43.   The willful and wanton misconduct on the part of Defendant is such that it justifies an award of punitive damages.

44.   All prerequisites to Plaintiff filing suit have been met.

45.   All allegations of this Complaint are incorporated into each Claim for Relief in this Complaint.

**FIRST CLAIM FOR RELIEF**
**(Sex Discrimination and Harassment Under Title VII)**

46.   Plaintiff is a member of a protected class (female).  Defendant discriminated against Plaintiff based on her gender.  Defendant has treated male officers more favorably than Plaintiff in the terms and conditions of their employment.

47.   Plaintiff's manager made unwanted and unwelcome sexual advances based on her gender. This conduct was severe and pervasive and constituted sexual harassment.

48.   Plaintiff timely filed a charge of sex discrimination.  The EEOC issued its Notice of Right to Sue thereafter.  (Exhibit 1).

49.   Plaintiff is damaged by Defendant's violations of Title VII as hereinabove alleged or as proven at trial.

1366321.1

## SECOND CLAIM FOR RELIEF
### (Retaliation Under Title VII)

50.   Defendant intentionally, knowingly and maliciously, or in the alternative, in reckless disregard of Plaintiff's federally protected rights, retaliated against Plaintiff after she reported her good faith concerns of sex discrimination to Defendant.

51.   Plaintiff timely filed a charge of retaliation discrimination.  The EEOC issued its Notice of Right to Sue thereafter.  (Exhibit 1).

52.   As a proximate result of Defendant's wrongful conduct, Plaintiff has been damaged as alleged herein or as proven at trial.

WHEREFORE, Plaintiff requests judgment in her favor and against Defendant as follows:

A.  For all injunctive and declaratory relief necessary, including a declaration that Defendant's conduct violated Title VII and enjoining Defendant from conduct violating Plaintiff's rights;

B.  For actual, consequential and incidental damages as alleged herein or as determined at trial;

C.  For punitive damages against Defendant;

D.  For special damages alleged or as proven at trial;

E.  For her attorneys' fees and costs incurred in this matter pursuant to 42 U.S.C. § 2000e-5(k) and any other applicable statute, rule or regulation;

F.  For interest on each element of damage, cost or attorneys' fees at the highest legal rate from the date such damage, cost or attorneys' fees was incurred until paid; and

G.  For such other and further relief as the Court deems just and proper.

8

1366321.1

DATED this 23rd day of May, 2024.

SHIELDS PETITTI & ZOLDAN, PLC

By /s/ Michael J. Petitti, Jr.
Michael J. Petitti, Jr.
5090 N. 40th Street, Suite 207
Phoenix, Arizona 85018
Attorneys for Plaintiff

9

1366321.1